FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAR 2 7 2018 ★

BROOKLYN OFFICE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

UNDER SEAL,

        Plaintiff,

    v.

UNDER SEAL,

        Defendant.

NO. **CV18-1851**

MAUSKOPF, J.

**JURY TRIAL DEMANDED**

REYES, M.J.

**FILED IN CAMERA AND UNDER
SEAL PURSUANT TO 31 U.S.C. 3730**

**COMPLAINT**

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ MAR 2 7 2018 ★

BROOKLYN OFFICE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JOHN DOE, | NO. _____ |
| Plaintiff and Relator, | |
| v. | JURY TRIAL DEMANDED |
| LIRO PROGRAM AND CONSTRUCTION MANAGEMENT, PE P.C., THE LIRO GROUP, and DSW HOMES LLC | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. 3730** |
| Defendants. | **COMPLAINT** |

## I. STATEMENT OF THE CASE

1.     This is an action to recover damages and civil penalties on behalf of the United States arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used or presented by Defendants the LiRo Program & Construction Management, PE P.C., the LiRo Group (collectively "the LiRo Defendants"), and DSW Homes, LLC (collectively with the LiRo Defendants, "Defendants") under the False Claims Act.

2.     In the aftermath of Hurricane Sandy, one of the costliest hurricanes in U.S. history, New York City administered a program to rebuild the homes destroyed by Sandy called Build it Back. The program was funded by the federal Government.

3.     LiRo Program & Construction Management was awarded a contract to rehabilitate, reconstruct, and elevate homes in Brooklyn that were affected by Hurricane Sandy. LiRo, in turn, used DSW Homes as a subcontractor.

4.     Defendants undertook several fraudulent schemes as part of their contract with the Government. Defendants submitted change orders for services that were not performed or were unnecessary, thereby fraudulently increasing the amount for which they were reimbursed.

5.     The LiRo Defendants represented to the Government that many of the homes were "substantially completed" even when they were not, so that they could collect a milestone payment from the Government.

6.     The LiRo Defendants also utilized the services of BUI Studios, and claimed credit for contracting with a M/WBE.

7.     As a result of Defendants' practices, the United States Government has been harmed in amounts reaching tens of millions of dollars.

1

## II.     JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729 and 3730. Relator establishes subject matter jurisdiction under 31 U.S.C. § 3730(b).

9.     There has been no public disclosure within the meaning of § 3730(e)(4)(A) of the allegations Relator is asserting.

10.     This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C § 1391(b) and 31 U.S.C § 3732(a), which authorizes nationwide service of process, because Defendants has minimum contacts with the United States.

11.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants regularly conducted substantial business within the Eastern District of New York at all relevant times.

## III.     PARTIES

### A.     Plaintiff and Relator John Doe

12.     Mr. Doe is a former employee of the LiRo Group. He directly witnessed the fraudulent conduct described in this Complaint and was retaliated against when he complained about the practices.

### B.     Defendants

13.     The LiRo Group is a construction company that offers construction management, engineering, environmental, architectural, and program management services. The Company provides services and has offices around the country. It was founded in 1983 by owner Rocco L. Trotta. It is headquartered in Syosset, New York.

2

14.     LiRo Program & Construction Management, PE P.C. is a subsidiary of The LiRo Group that provides construction management services. It is headquartered in Syosset, New York.

15.     Defendant DSW Homes LLC is a privately held home building company with an office in New York. It functions as a subcontractor to LiRo Program & Construction Management.

## IV.    **REGULATORY FRAMEWORK**

### A.    **The False Claims Act**

16.     The False Claims Act ("FCA") holds liable anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" by the United States, 31 U.S.C. § 3729(a)(1)(A), or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id*. § 3729(a)(1)(B). Those who violate the FCA are liable for civil penalties of up to $21,562.80 per violation, three times the damages sustained by the Government, and litigation costs. *See id.* § 3729(a)(1), (3).

17.     The FCA provides that a person with knowledge of false or fraudulent claims or records presented to the United States may bring a private (*qui tam*) action on behalf of both the person (the "relator") and the Government, and may share in any recovery of money by or on behalf of the United States in the action. A prevailing relator is also entitled to attorneys' fees, costs, and expenses. *See* 31 U.S.C. § 3730(d).

### B.    **The Community Development Block Grant – Disaster Recovery ("CDBG-DR")**

18.     On January 29, 2013, the federal Government passed the "Disaster Relief Appropriations Act, 2013" (Public Law 113-2) which provides $16 billion in Community Development Block Grant Disaster Recovery (CDBG-DR) funds to repair and restore areas affected by Hurricane Sandy.

3

19.     New York City administers a plan to utilize the funding to rebuild homes, businesses and communities damaged by the Hurricane.

20.     On May 7, 2013, the Department of Housing and Urban Development (HUD) approved the City's initial Action Plan, which detailed the City's plans for its first allocation of $1,772,820,000 of CDBG-DR funding.

21.     On November 18, 2013, HUD announced a second round of funding and the City of New York was awarded an additional $1,447,000,000.

22.     The City was awarded a third allocation totaling $994,056,000 on October 16, 2014, bringing the City's total CDBG-DR funding to $4,213,876,000.

23.     In late 2014, New York City published a Request for Proposals ("RFP"). The RFP invited construction management firms ("CMs") to submit bids for rebuilding homes destroyed by Hurricane Sandy as part of New York City's "Build it Back Program." The RFP invited bids for projects in Queens, Staten Island, and Brooklyn.

24.     For Brooklyn, the RFP estimated that 2,500 homes needed rehabilitation, 800 homes needed to be elevated, and 25 homes required total reconstruction.

25.     The LiRo Program & Construction Management was awarded a $275,530,566 contract.

26.     On June 16, 2017, the contract amount was modified and increased by $88 million.

27.     The same month, New York City announced that the Build it Back program was half a billion dollars over budget, and that city taxpayers would need to bail the program out.

C.    **LiRo's Contract with the Government ("the Contract").**

### 1. Substantial Completion

28.    The Contract states that LiRo will receive milestone payments during its performance of the Contract. LiRo receives a "Substantial Completion Payment" once a home is 90% completed.

29.    The Contract provides for the following Milestone Payments: (42.2)

| Milestones | Percentage of construction value billed |
| --- | --- |
| Mobilization | 10% |
| 25% completion | 10% |
| 50% completion | 25% |
| 75% completion | 25% |
| 90%: Substantial completion | 10% |
| 100%: Final acceptance | 20% |

30.    The Contract requires LiRo to "[i]nspect each Home in conjunction with the Consultant and the Commissioner's Representative at the time of Substantial Completion"; "[f]urnish a detailed report to the Commissioner and the Consultant setting forth any discrepancies or deficiencies in the finished Work"; "[t]ake all appropriate action through its Subcontractors for the repair, replacement, restoration or rebuilding, as the Commissioner may determine, of any discrepancies or deficiencies in the finished Work"; and "[f]inalize all necessary Punch Lists, including completion dates for all items, and expedite execution of the list by its Subcontractors." (11.6.15)

31.    In addition, LiRo is required to take photographs to document the progress of the construction work "on a bi-weekly basis until Substantial Completion of the Work". It is required to include the photographs in each monthly progress report. (11.6.21)

32.    "Substantial Completion" refers to a "written determination" by a Government agent that "the Work required for a Home is substantially, but not entirely, complete and the

5

approval of the 'Final Approved Punch List.'" (1.34)

33.     The "Final Approved Punch List" refers to a list "specifying those items of Work to be completed by the Contractor after Substantial Completion and dates for the completion of each item of Work." (1.18.1)

34.     The Contract states that work will be "Substantially Completed" when "the Commissioner's Representative has inspected the Work in the Home and has made a written determination that it is substantially complete" and that:

> Following inspection of the Work in a Home, the Commissioner's Representative shall furnish the Contractor with a final punch list, specifying all items of Work to be completed and proposing dates for the completion of each specified item of Work. The Contractor shall then submit in writing to the Commissioner's Representative within ten (10) Days of the Commissioner's Representative furnishing the final punch list either acceptance of the dates or proposed alternative dates for the completion of each specified item of Work. If the Contractor proposes alternative dates, then, within a reasonable time after receipt, the Commissioner's Representative, in a written notification to the Contractor, shall approve the Contractor's completion dates or, if they are unable to agree, the Commissioner's Representative shall establish dates for the completion of each item of Work. If the Contractor neither accepts the dates nor proposes alternative dates within ten (10) Days, the schedule proposed by the Commissioner's Representative shall be deemed accepted. The latest completion date specified shall be the date for Final Acceptance of the Work. (10.4.1.1-10.4.1.2)

35.     The Contract further states:

> The date of approval of the Final Approved Punch List, shall be the date of Substantial Completion. The date of approval of the Final Approved Punch List shall be either (a) if the Contractor approves the final punch list and proposed dates for completion furnished by the Commissioner's Representative, the date of the Contractor's approval; or (b) if the Contractor neither accepts the dates nor proposes alternative dates, ten (10) Days after the Commissioner's Representative furnishes the Contractor with a final punch list and proposed dates for completion; or (c) if the Contractor proposes alternative dates, the date that the Commissioner's Representative sends written notification to the Contractor either approving the Contractor's proposed alternative dates or establishing dates for the completion for each item of Work. (10.4.2)

**2.      Change Orders**

36.      Article 21 of the Contract states:

Should the Contractor encounter during the progress of the Work, subsurface conditions at the Site materially differing from any shown on any documents furnished by the Commissioner or such subsurface conditions as could not reasonably have been anticipated by the Contractor and were not anticipated by the City, which conditions will materially affect the cost of the Work to be done under the Contract, **the attention of the Commissioner must be called immediately to such conditions before they are disturbed**. The Commissioner shall thereupon promptly investigate the conditions. If he finds that they do so materially differ, or that they could not reasonably have been anticipated by the Contractor and were not anticipated by the City, the Contract may be modified with his written approval. (Emphasis added.) (21.1)

37.      The Contract further states:

Changes may be made to this Contract only as duly authorized by the Agency Chief Contracting Officer or his or her designee. Contractors deviating from the requirements of an original purchase order or contract without a duly approved change order document, or written contract modification or amendment, do so at their own risk. All such changes, modifications and amendments will become a part of the original Contract. Work so ordered must be performed by the Contractor. (26.1)

38.      Under the Contract, "Contract changes will be made only for Work necessary to complete the Work included in the original scope of the Contract, and for non-material changes to the scope of the Contract." (26.2)

39.      When a subcontractor requests a change order, the Contract requires LiRo to undertake the following responsibilities: (11.6.10)

a.      "Review, evaluate and make a decision with respect to the validity of all written Subcontractor requests for change orders." LiRo's decision as to the validity of the change order is required to be in writing and to "provide a reasonably detailed explanation for the decision based upon the information presented by the Subcontractor and the requirements of the Construction Documents."

7

b.     If LiRo decides that the Subcontractor's request for a change order is valid, it is required to prepare the proposed change order and submit it to the Government for approval. The change order must be accompanied by the LiRo's written decision as to the validity of the change order; the cost proposal submitted by the Subcontractor; LiRo's evaluation of such cost proposal; and LiRo's own cost estimate of the quantities of labor, equipment and materials required for the performance of the proposed change order. Further, LiRo "must be prepared to substantiate the information with respect to the change order to the Commissioner, the Engineering Audit Officer, the Comptroller and any other agency having jurisdiction in this area."

c.     If the Government approves the LiRo's request for a Subcontractor change order, LiRo is required to negotiate a price, i.e., a lump sum price or unit prices, for the performance of the proposed change order work and submit it to the Government for approval.

40.     If LiRo or any of its subcontractors perform "Extra Work," defined as "work not reasonably foreseeable at the time of the execution of this Agreement or not reasonably inferable from the Agreement," LiRo is required to provide the Government daily with three copies of written statements signed by a representative at the Site showing: (1.17)

- The name and number of each Worker employed on such Work or engaged in complying with such determination or order,
- the number of hours employed, and the character of the Work each is doing; and
- The nature and quantity of any materials, plant and equipment furnished or used in connection with the performance of such Work or compliance with such determination or order, and from whom purchased or rented. (30.1)

## 3.     Minority/Women Business Entities ("M/WBE")

41.     The Contract includes terms requiring "Participation by Minority Owned and Women Owned Business Enterprises in City Procurement." The Participation Goals are a

percentage of the total dollar value of the Contract, and may be met a M/WBE Contractor, M/WBE subcontractors, or qualifying joint ventures.

42.     The Contract requires that the Contractor submit a statement of how it will satisfy the M/WBE requirements.

43.     In Schedule B of the Contract, the LiRo Defendants represented that they would allocate 25% of the Contract amount to participation by M/WBE. As of April 25, 2015, LiRo represented that it would have over $62 million in M/WBE participation. LiRo did not receive a waiver from the M/WBE requirements. Nor was LiRo itself a M/WBE Prime Contractor or a joint venture.

44.     Among the penalties for violating these provisions are termination of the contract, damages, withholding of payment, and a finding of default. (68.II.4)

**4.     Certification by Occupational Safety and Health Adminstration**

45.     The Contract specifies that "all laborers, workers, and mechanics employed in the performance of the Contract on the work site, either by the Contractor, Subcontractor or other person doing or contracting to do the whole or a part of the work contemplated by the contract, shall be certified prior to performing any Work as having successfully completed a course in construction safety and health approved by the United States Department of Labor's Occupational Safety and Health Administration that is at least ten hours in duration." (35.2)

**5.     Required Record-keeping**

46.     The contract requires keeping accurate records. It states that LiRo shall "[k]eep accurate and detailed written records of the progress of each Home within the Work Order and the Project during all stages of planning and construction. (11.6.5(a))

9

47. The Contract also requires LiRo to "Maintain a daily job diary or log book describing all activities which occurred on the Project on a daily basis, including without limitation, all Work accomplished, the number of workers, identified by trade, employed at the Site by the Subcontractor(s), the number of hours worked, material shortages, labor difficulties, weather conditions, visits by officials, decisions reached, specific problems encountered, general and specific observations, and all other pertinent data relative to the performance of the Work." (11.6.5(b))

48. LiRo and its subcontractors are required to "maintain on the Site the original payrolls or transcripts [and] submit original payrolls or transcripts, subscribed and affirmed by it as true, with each and every payment requisition." (39.1)

49. LiRo must "maintain the payrolls or transcripts thereof for six (6) years from the date of completion of the Work on [the] Contract." (39.2

50. Moreover, when LiRo or a Subcontractor is performing Extra Work on a Time and Material Basis or disputed work, it must provide the Commissioner's Representative with a daily report showing *inter alia* "[t]he name and number of each Worker employed on such Work or engaged in complying with such determination or order, the number of hours employed, and the character of the Work each is doing." (30.1.1)

## V. DEFENDANTS HAVE SUBMITTED OR CAUSED TO BE SUBMITTED FALSE CLAIMS TO GOVERNMENT PROGRAMS.

### A. Defendants Made False Statements on Change Order Forms In Order to Obtain Funds From the Government

51. DSW Homes routinely submitted change order forms for services that were not required.

52.     The LiRo Defendants failed to appropriately study these change order requests, and opted to rubber stamp them to the Government instead. Oftentimes, the services were alleged to have already been performed prior to LiRo receiving change order requests, such that it was impossible to verify that the work was needed or actually performed. This has led to extraordinary over-spending on unnecessary work.

53.     Contrary to the contractual requirements, LiRo did not inform the Government of the conditions before they were disturbed.

54.     Because LiRo did not adequately review the documentation, it was also not "prepared to substantiate the information with respect to the change order" to the Government as required by its Contract.

**1.     Helical Piles**

55.     Helical piles are a system utilized for building deep foundations which create a platform on which an elevated home can rest. Defendants regularly submitted change orders for additional unnecessary helical piles.

56.     On February 12, 2016, DSW Homes submitted a change order request for 281 additional helical extensions and 63 additional helical extensions with tieback plates at 30 Dare Court. The cost for these items was $56,980. DSW Homes applied a multiplier of 2, resulting in a total cost of $113,960 DSW Homes noted that the work had already been done.  LiRo submitted this request to the Government without being able to verify the necessity of the work or that it was infact performed.

57.     The need for such a large number of helical extensions on a single home was very unusual, but Relator was unable to verify the need due to the lack of documentation.

58.     On February 22, 2016, DSW Homes submitted a change order request for additional helical pile extensions and related costs at 104 Noel Avenue. This included standard helical pile extensions, helical pile extentions with extensions, and test piles for helical grouted piles. The cost for the items was over $24,000. On February 24, 2016, LiRo submitted this request to the Government. LiRo submitted this request to the Government without being able to verify the necessity of the work or that it was in fact performed.

### 2.     Asbestos Abatement

59.     Defendants routinely submitted change orders for asbestos abatement that was not observed during the initial walk through by the Department of Design & Construction, LiRo, an independent architect, independent engineer, and the subcontractor.

60.     For example, on January 18, 2016, DSW Homes submitted a change order request for asbestos abatement at 20 Lester Court. DSW Homes submitted a cost estimate of $4,656.27. LiRo accepted the cost estimated and added a multiplier of two. LiRo submitted a change order for $9312.54 even though DSW Homes had not properly documented the need for any abatement .

### B.     Defendants Submitted False Claims For Work That Was Not Performed.

61.     In addition to submitting change orders for unnecessary work, Defendants also submitted change orders for work that was not performed at all.

62.     Relator observed that Defendant DSW Homes routinely submitted suspicious change order forms for items that were not necessary for the work being performed. He went to the sites in order to check whether the additional items were being used and found that they were not. Therefore, the Government was being billed for items that were never used and services that were not performed.

12

63.     The Defendants regularly requested additional dumpsters that Relator believes were not used. The use of dumpsters was suspicious because often the streets in the area were too narrow to accommodate the number of dumpsters. Furthermore, some change orders specified that "12 yard dumpsters" were being used, a size that Relator knew did not exist.

64.     On August 26, 2016, DSW Homes submitted a change order request for the property at 2784 Brown Street for five dumpsters, and excavation of dirt. In turn, LiRo submitted the request to the Government on the same day, requesting approval for a $25,480 increase in the contract amount. LiRo submitted this change order without the benefit of an inspection report or any other substantiation. Relator visited the site and found that the number of dumpsters present at the site was far fewer than the number listed in the change order.

**C.     The LiRo Defendants Falsely Claimed that Work was "Substantially Completed" In Order to Obtain Government Funds.**

65.     The Contract provides that once a home is "substantially completed," LiRo is entitled to a milestone payment.

66.     LiRo routinely claims to the Government that homes are "substantially completed" even when they are not in order to claim payments. LiRo would claim that houses that did not even have roofs or meters were "substantially completed." Some homes that did not have permits for construction from the Department of Buildings were also claimed to be substantially completed.

67.     LiRo coerces home owners to falsely certify that their home has been "substantially completed" by telling them that if they do not certify that the home has been substantially completed, then they will not be able to move back in to their houses.

68.     For example, LiRo claimed that a property on 2793 Brown was substantially completed before there was any electrical work performed on the property. The property had

13

simply been elevated and lowered.

69.     In July 2017, the Government began taking away projects from LiRo and assigned them to other contractors because it realized that LiRo was not able to complete them.

70.     The reassignment of homes meant a loss of earnings for LiRo. In order to avoid losing more projects, LiRo falsely stated that it had substantially completed projects.

71.     For example, LiRo claimed that the property on 104 Gotham was substantially completed without adequate plumbing.

72.     LiRo also falsely claimed that a property on 70 Beacon was substantially completed. Because of the lack of completion, the house flooded after the family was allowed to move in.

**D.      Defendant LiRo Falsely Stated That It Had Met Its M/WBE Requirement**

73.     The LiRo Defendants represented that they would allocate 25% of the Contract amount to participation by M/WBE. As of April 25, 2015, LiRo represented that it would have over $62 million in M/WBE participation. LiRo did not receive a waiver from the M/WBE requirements. Nor was LiRo itself a M/WBE Prime Contractor or a joint venture.

74.     LiRo subcontracted with "BUI Studio" and "BUISTUDIO LLC." These were sham companies operated by Trang Bui, a LiRo employee. In fact, the employees of BUI Studio used LiRo email addresses. Ms. Bui herself attended a teleconference for bidders with the Governor's Office of Storm Recovery on behalf of LiRo.

75.     BuiStudio LLC's vendor profile on the New York City website lists only LiRo companies as its clients.

76.     By using a sham company to meet its M/WBE requirements, the LiRo Defendants defrauded the Government in performance of their Contract.

77.     Had the Government known that LiRo had used a sham company, the Government would have refused to make payments and/or terminated the Contract.

**E.      Defendants Falsely Claimed Compliance with OSHA**

78.     LiRo did not follow the contractual requirement to ensure that "all laborers, workers, and mechanics employed" had "completed a course in construction safety and health approved by the United States Department of Labor's Occupational Safety and Health Administration that is at least ten hours in duration."

79.     Relator noticed that several employees hired for the Build it Back project did not have their OSHA cards.

80.     Relator would visit construction sites and ask workers if they had OSHA cards. Relator would make notes when workers did not have OSHA cards or had expired OSHA cards.

81.     When projects were being billed for, Relator found that some workers without current OSHA cards were being billed for.

82.     For example, Elliott Joyner, listed on a payroll for the week ending on January 17, 2016, only had a long-expired OSHA card when the Relator asked him for it during a site visit.

83.     Terrance Fletcher, listed on a payroll for the week ending on January 17, 2017, did not have his OSHA card when asked by the Relator.

**F.      Defendants Submitted False Payroll Statements**

84.     LiRo submitted payrolls to the Government reflecting work by employees who had not signed in as present on the site.

85.     For example, LiRo and Shorecon listed Norman Avila on the payroll for the week ending January 31, 2016. However, Relator found that Norman Avila was not present on the sign-in sheet.

15

86.     LiRo and Shorecon listed Anthony Manio on the payroll for the week ending January 31, 2016. However, Relator found that Anthony Manio was not present on the sign-in sheet.

87.     LiRo and Shorecon listed Michael Sterlacci on the payroll for the week ending January 31, 2016. However, Relator found that Michael Sterlacci was not present on the sign-in sheet.

88.     These payrolls required the signatory to attest that they understood that falsification of the statement was a punishable offense. The payroll was signed by Nicole McNally on April 11, 2016.

**G.     The LiRo Defendants Retaliated Against Relator for Complaining About the Fraudulent Practices and Refusing to Process Fraudulent Change Orders.**

89.     Relator was hired by the LiRo Defendants in mid-2012 as an engineer. In November 2015, he was transferred to the Build it Back project. Within a month of the transfer Relator became alarmed about the fraudulent conduct he saw.

90.     In December 2015, Relator complained to Yianna Pavlakos, Director, about the fact that the change orders that were received were not substantiated. He also complained about the fact that the LiRo Defendants were claiming that homes were substantially completed when they were not.

91.     Ms. Pavlakos said she would look into it but did not address Relator's complaints.

92.     Over the following months, Relator repeatedly complained about the LiRo Defendants' fraudulent practices to several employees including Ms. Pavlakos; Patrick Moore, Regulatory Compliance Officer; George Silos, Project Manager; Dreu Beers, Project Manager; and Frank Pfister, Compliance Auditor.

93.     In addition to complaining about the fraudulent practices, Relator did not submit change orders that were unsubstantiated or fraudulent, choosing to set them aside instead. For example, Relator refused to process a change order for 1226 East 83rd Street.

94.     Every Friday, Ms. Pavlakos would complain to Relator that he had not processed the fraudulent change orders. Relator would respond that they were unsubstantiated and could not be submitted to the Government in the current form. Ms. Pavlakos would insist that he get them done.

95.     On September 16, 2016, Relator was terminated. Ms. Pavlakos told him that he was being terminated for not processing change orders quickly enough.

## VI.    COUNTS

### A.    Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

96.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

97.     Defendants knowingly presented and caused to be presented to the Government false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(1).

98.     As a result of Defendants' actions as set forth above in this Complaint, the United States of America has been, and may continue to be, severely damaged.

### B.    Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

99.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

100.    Defendants knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to the payment of a false or fraudulent claims, thereby causing false

or fraudulent claims for payment to actually be paid or approved, in violation of 31 U.S.C. § 3729(a)(2).

101.    The United States of America, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid and may still be paying or reimbursing for services provided by Defendants.

102.    As a result of Defendants' actions as set forth above in this Complaint, the United States of America has been, and may continue to be, severely damaged.

WHEREFORE, Relator prays for judgment against Defendants as follows:

A.    That Defendants be ordered to cease and desist from submitting any more false claims, or further violating the FCA;

B.    That judgment be entered in the United States of America's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a)(1), plus a civil penalty per claim as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Public Law 114-74 (Nov. 2, 2015) (currently set at $11,181 to $22,363), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

D.    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(D);

E.    That Defendants be ordered to disgorge all sums by which it has been enriched unjustly by its wrongful conduct; and

F.   That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this suit; and

G.   That Relator be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(a), Relator hereby demands a trial by jury of all issues so triable.

Dated: March 27, 2018

Respectfully submitted,

By:_____

Ross B. Brooks
Inayat Ali I. Hemani
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas
31st Floor
New York, NY 10019
Telephone:   (646) 402-5650
Facsimile:   (646) 402-5651
rbrooks@sanfordheisler.com
ihemani@sanfordheisler.com

*Attorneys for Relator*

19